UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LADONNA LOMELI and JOHN FRANKLIN JR., Plaintiffs, v. UNITED PARCEL SERVICE COMPANY, a foreign corporation authorized to do business and doing business in California, Defendant. | Case No.: 25cv422-LL-AHG **ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAYING ACTION [18]** **ORDER DENYING EX PARTE REQUEST FOR ORAL ARGUMENT [24]** |

Before the Court is Defendant United Parcel Service Company's ("UPS") Motion to Compel Arbitration ("Motion"). Dkt. 18. Plaintiffs Ladonna Lomeli and John Franklin Jr. opposed the Motion [Dkt. 22] and Defendant replied [Dkt. 23]. The Court finds this matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1 and therefore **DENIES** Plaintiffs' Ex Parte Request for Oral Argument [Dkt. 24]. For the reasons below, the Court **OVERRULES** the parties' evidentiary objections, **GRANTS** Defendant's Motion to Compel Arbitration, and **STAYS** this action pending the completion of arbitration proceedings.

/ / /

## I. BACKGROUND

Plaintiffs are a couple that runs an online marketplace. Declaration of Caitlin Sinclaire Blythe ("Blythe Decl.") ¶ 5, Dkt. 18-1. On February 26, 2025, Plaintiffs brought this putative class action on behalf of consumers who purchased a UPS shipping label from a third-party retailer from January 1, 2015 to present. Compl. ¶¶ 1, 14, Dkt. 1. Plaintiffs allege that UPS "has engaged in a practice of intentionally overcharging third party retailers for packages . . . by adding surcharges that should never have been charged." *Id.* ¶ 4. Plaintiffs assert five causes of action: 1) conversion, 2) unjust enrichment, 3) quasi-contract, 4) money had and received, and 5) a violation of California Unfair Competition Law. *Id.* ¶¶ 21–46.

In response, UPS moved to compel arbitration, asserting that Plaintiffs agreed to arbitrate their claims when they purchased UPS shipping labels from third-party retailers. Mot. 7–8. According to UPS, Plaintiffs purchased UPS shipping labels from PayPal, Pirate Ship, and ShipStation on at least four occasions in October 2021 (Pirate Ship), June 2024 (Pirate Ship), January 2023 (ShipStation), and September 2023 (PayPal). *Id.* at 9–11.

### A. Pirate Ship

#### 1. October 2021

On October 5, 2021, Plaintiff Franklin purchased a UPS label through Pirate Ship. *See* Declaration of Janese Coleman ("Coleman Decl.") ¶ 9, Dkt. 18-3; Declaration of John Franklin Jr. ("Franklin Decl.") ¶¶ 9, 11, Dkt. 22-1. In October 2021, when a customer tried to purchase a UPS shipping label through Pirate Ship, they were presented with a pop-up screen that stated in part: "To proceed, just agree to and accept the Terms and Conditions, UPS List of Prohibited Articles, and UPS Technology Agreement." Coleman Decl. ¶ 29. The three documents were shown in blue bold font to indicate they were hyperlinked. *Id.* ¶ 30. On the right bottom corner was a large green button with the text "Accept & Buy Label" *Id.* Below is screenshot of the pop-up screen that was presented to Pirate Ship customers in October 2021:




*Id*. According to UPS, it was not possible to purchase a UPS label through Pirate Ship without clicking the green "Accept & Buy Label" button. *Id*. ¶¶ 21, 29.

All three hyperlinked documents in the pop-up screen ("Terms and Conditions," "UPS Prohibited Articles," and "UPS Technology Agreement") incorporated "UPS Tariff/Terms and Conditions of Service" and included hyperlinks to the document on the UPS website. *See* Coleman Decl. ¶¶ 22, 29, 31–35; Ex. H at 62, Ex. I at 67, Ex. J at 71. If UPS updated the "UPS/Tariff Terms and Conditions of Service," Pirate Ship required its accountholders to click through the same process before shipping another UPS package. *Id*. ¶¶ 23, 29.

Section 54 of UPS Tariff/Terms and Conditions of Service set out "Claims and Legal Actions: Individual Binding Arbitration of Claims," which stated in relevant part:

> Claimant and UPS agree that, except for disputes that qualify for state courts of limited jurisdiction (such as small claims, justice of the peace, magistrate court, and similar courts with monetary limits of less than $30,000 on their jurisdictions over civil disputes), any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by individual (not class-wide nor collective) binding arbitration.

*Id*. ¶¶ 14, 15, Ex. B at 27–28.

/ / /

### 2. June 2024

On June 19, 2024, Plaintiff Lomeli purchased a UPS shipping label through Pirate Ship. Coleman Decl. ¶ 6; Declaration of Ladonna Lomeli ("Lomeli Decl.") ¶ 3. Similar to the process described above for October 2021, when a customer tried to purchase a UPS shipping label through Pirate Ship in June 2024, they were presented with a pop-up screen which stated in part: "By checking this box, I accept and agree to the UPS Terms and Conditions and the UPS Technology Agreement, and I will not ship any items in violation of the UPS List of Prohibited and Restricted Items for Shipping." Coleman Decl. ¶ 20. The three documents were shown in bold blue font to indicate they were hyperlinked. *Id.* To proceed, customers had to check the box next to the statement and click on the large green button that said "Accept & Buy Label." *Id.* ¶ 19. Below is a screenshot of the pop-up screen that was presented to Pirate Ship customers in June 2024:




*Id.* ¶ 20. According to UPS, it was not possible to purchase a UPS label through Pirate Ship without checking the box and clicking the green button. *Id.* ¶ 21. In addition, customers were required to enter the address the package was being shipped to and from, the weight and dimensions of the package, and enter payment information to create a UPS shipping label through Pirate Ship. *Id.* ¶ 19

All three hyperlinked documents in the pop-up screen incorporated "UPS Tariff/Terms and Conditions of Service" and included hyperlinks to the document on the

UPS website, which included a similar arbitration provision as the 2021 version. *See id*. ¶¶ 13, 15, 26–28, Ex. A at 19, Ex. E at 43, Ex. F at 50, Ex. G at 55.

**B. Ship Station**

Plaintiff Lomeli opened an account[1] with ShipStation on January 31, 2023 and purchased UPS labels through ShipStation. Declaration of Darryl Barber ("Barber Decl.") ¶ 19, Dkt. 18-2. In January 2023, when a customer tried to purchase a UPS shipping label through ShipStation, they were presented with a pop-up screen that stated: "To start shipping with UPS, you must first agree to the following" and provided hyperlinks to (1) UPS Promotional Rates Agreement, (2) UPS Technology Agreement, and (3) List of Prohibited Articles. Barber Decl. ¶ 20. To proceed, ShipStation customers were required click the green button that said, "I Agree." *Id*. Below is a screenshot of a pop-up screen that was presented to ShipStation customers in January 2023:




*Id*. ¶ 21. According to UPS, it was not possible to purchase a UPS label through ShipStation without clicking the green "I Agree" button. *Id*. ¶ 22.

---

[1] While Plaintiff Lomeli denies opening a ShipStation account on January 31, 2023 or shipping packages on any ShipStation account ("Lomeli Decl." ¶¶ 7–8), her response to UPS' interrogatory no. 10 states that she "shipped some products" for Riteway North America, the business that is associated with the account that was opened on January 31, 2023. *See* Blythe Decl. Ex. 5 at 28; Barber Decl. ¶ 19.

All three documents in the pop-up screen incorporated "UPS Tariff/Terms and Conditions of Service" and included hyperlinks to the document on the UPS website, which also included an arbitration provision. *See* Barber Decl. ¶¶ 23, 25–27, Ex. AA at 13, Ex. BB at 19, Ex. CC at 23, Ex. EE at 44.

**C. PayPal**

Plaintiff Franklin created an account with PayPal on September 18, 2023 and purchased UPS labels through PayPal. *See* Barber Decl. ¶ 6; Franklin Decl. ¶ 8. To purchase a UPS shipping label through PayPal, PayPal customers had to enter their shipping location, select their shipping preferences, and agree to UPS' contractual terms and conditions. Barber Decl. ¶ 7. Specifically, PayPal presented a pop-up screen with hyperlinks to (1) UPS Promotional Rates Agreement, (2) UPS Technology Agreement, and (3) UPS List of Prohibited Articles, among other things. *Id.* ¶ 8. To proceed, PayPal customers were required to click a dark blue button that said, "Agree and Start Shipping." *Id.* ¶ 7. Below is a screenshot of a pop-up screen presented to PayPal customers as of September 2023:



*Id.* ¶ 8. According to UPS, it was not possible to set up an account for shipping with UPS through PayPal without clicking the blue "Agree and Start Shipping" button. *Id.* ¶ 9.

All three documents in the pop-up screen incorporated "UPS Tariff/Terms and Conditions of Service" and included hyperlinks to the document on the UPS website, which included an arbitration provision. *See* Barber Decl. ¶¶ 11–17, AA at 12, BB at 19, CC at 23, DD at 34.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that arbitration agreements generally "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes a general "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4).

"Generally, in deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)); *see also Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015) ("A party seeking to compel arbitration has the burden under the FAA to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue.") (quoting *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008)). The party seeking to compel arbitration bears the burden of proving the existence of an arbitration agreement by "a preponderance of evidence." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023).

## III. DISCUSSION

### A. Evidentiary Objections

#### 1. Plaintiffs' Objections

Plaintiffs object to declarations of Darryl Barber and Janese Coleman [Dkts. 18-2, 18-3] Defendant submitted in support of its Motion to Compel Arbitration. *See generally* Opp'n ¶¶ 1–15. Essentially, Plaintiffs argue that the screenshots and documents included in the declarations were either incomplete or inaccurate. *Id*.

For example, Plaintiffs object to Exhibit J from Coleman's declaration, asserting that the webpage is from Wayback Machine and not from the UPS website as Coleman claims. Opp'n ¶ 4. However, upon close inspection, it is evident that Wayback Machine is an internet archive tool that displayed the webpage from the UPS website (https://www.ups.com/us/en/help-center/shipping-support/prohibited-items.page) as it existed in or around September 2021. Coleman Decl. Ex. J at 71.

Moreover, "[o]n a motion to compel arbitration . . . the Court 'does not focus on the admissibility of the evidence's form,' so long as the contents are capable of presentation in an admissible form at trial." *Lomeli v. Midland Funding, LLC*, No. 19-CV-01141-LHK, 2019 WL 4695279, at *7 (N.D. Cal. Sept. 26, 2019) (quoting *McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 7388530, at *4 (C.D. Cal. Oct. 26, 2017)). Objections to documentary evidence "on the basis of a failure to comply with the technicalities of authentication requirements or the best evidence rule are, therefore, inappropriate." *McKee*, 2017 WL 7388530, at *4 (overruling objections to printouts of website flows in the supporting declaration); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 989 (N.D. Cal. 2017) (overruling objections to screenshots of defendant's sign-up and registration process). Plaintiffs do not otherwise argue that any of the evidence could not be produced in a proper format at trial. Therefore, Plaintiffs' objections to the documentary evidence are overruled.

Further, Plaintiffs' hearsay objections lack merit because Barber and Coleman have personal knowledge. *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th

Cir. 1990) (declarants' personal knowledge and competence to testify are reasonably inferred from their positions"); *Mitchell v. Ecolab, Inc.*, No. 1:22-CV-01088-EPG, 2023 WL 2666391, at *4 (E.D. Cal. Mar. 28, 2023) (declaration "based on [declarant's] own knowledge, her review of business records, and on her position as a Human Resources Representative II, which makes her familiar with [defendant's] practices with respect to employee agreements . . . lays a proper foundation and establishes her personal knowledge as to her declaration and the attached exhibits [i.e., arbitration agreements]"). Barber is the Senior Manager of Corporate Marketing for the Digital Access Program and is familiar with the onboarding process for PayPal and ShipStation. Barber Decl. ¶ 1. Coleman is a Marketing Director and is familiar with the onboarding process for Pirate Ship. Coleman Decl. ¶ 1. Thus, the Court finds that their declarations are based on their personal knowledge. Additionally, Plaintiffs do not otherwise claim that such testimonies would be inadmissible at trial. Therefore, Plaintiffs' hearsay objections are overruled.

Accordingly, the Court **OVERRULES** Plaintiffs' objections.

**2. Defendant's Objections**

In its reply, Defendant submitted objections to Plaintiffs' declarations that were filed in support of Plaintiffs' Opposition. *See* Dkt. 23-4. The Court does not rely on the parts of the declarations to which Defendant objects. Therefore, Defendant's objections are **OVERRULED** as moot.

Accordingly, the Court **OVERRULES** parties' evidentiary objections.

**B. Motion to Compel Arbitration**

**1. Agreement to Arbitrate**

The Federal Arbitration Act (FAA) requires courts to compel arbitration of claims covered by an enforceable arbitration agreement. 9 U.S.C. § 3. The FAA limits the courts' role to "determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).

/ / /

**a. Contract Formation**

Plaintiffs and UPS dispute over whether they agreed to arbitrate Plaintiffs' claims. "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). The parties agree that California law governs the issue. *See* Mot. at 18; Opp'n at 22. "To form a contract under California [] law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023).

"Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct." *Berman*, 30 F.4th at 855 (citation omitted). "However, 'the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" *Id.* (quoting Restatement (Second) of Contracts § 19(2) (1981)). "These elemental principles of contract formation apply with equal force to contracts formed online." *Berman*, 30 F.4th at 855–56. "Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id.* at 856.

As relevant here, a clickwrap, or click-through, agreement is formed when "an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021). Courts generally find clickwrap agreements to be enforceable because "the consumer has received notice of the terms being offered and . . . 'knows or has reason to know that the other party may infer from his conduct that he assents' to those terms." *Berman*, 30 F.4th at 856. Accordingly, an enforceable agreement may be found online where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Id.*

/ / /

**b. Reasonably Conspicuous Notice**

The first step of the analysis "has two aspects: the visual design of the webpages and the context of the transaction." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025). Both aspects "should be considered together." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1155 (9th Cir. 2025)

**i. Visual Aspect of the Website**

First, courts consider the visual design of the webpages, such as "the size, color, contrast, and location of any text notices; the obviousness of any hyperlinks; and overall screen clutter." *Ortiz v. Univ. Credit Union*, No. 25-2207, 2025 WL 3765497, at *1 (9th Cir. Dec. 30, 2025) (citing *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 947 (2022)). While terms may be disclosed through hyperlinks, the presence of a hyperlink "must be readily apparent" to alert a "reasonably prudent Internet user." *Berman*, 30 F.4th at 857.

Here, before they could purchase a UPS label from the third-party retailers, Plaintiffs were presented with a pop-up screen that presented the three agreements: UPS Terms and Conditions, UPS Prohibited Articles, and UPS Technology Agreement in bright blue font that not only denoted the existence of hyperlinks but also clearly distinguished the text from the white background. *See e.g.*, *Oberstein*, 60 F.4th at 516 (finding that the websites provided reasonably conspicuous notice of the terms because the terms were in "bright blue font, distinguishing it from the surrounding text"). The hyperlinks were also located in the center of the pop-up screens, making them easy for the users to notice, rather than burying them on the bottom of the webpage or placing them outside of the natural flow of actions.

Below or above the hyperlinks, Plaintiffs were advised that by taking a specific action, such as by checking a box or clicking a button, they agreed to be bound by the terms and conditions in the hyperlinks (e.g., "By checking this box, I accept and agree to the . . . ."; "By proceeding, you agree to the above terms and conditions."). Below the phrases were action buttons users needed to click to advance to the next page (e.g., "Accept & Buy Label"; "I Agree"; "Agree and Start Shipping"). In other words, the hyperlinks, advisal, and the action buttons were within "the natural visual path of completing the [purchase]

process." *Morrison v. Yippee Ent., Inc.*, No. 24-7235, 2025 WL 2389424, at *1 (9th Cir. Aug. 18, 2025) (reversing district court's order and finding reasonably conspicuous notice where the hyperlink was located directly above the action button and next to the warning language); *see also Dohrmann v. Intuit, Inc.*, 823 F. App'x. 482, 484 (9th Cir. 2020) (finding that the webpage provided sufficient notice because the relevant warning language and hyperlink to the terms and conditions "were located directly below the sign-in button"). The action buttons were also in bright green or blue against a white background, distinguishing the button from the rest of the screen and making it easily noticeable.

The visual aspects of these pop-up screen were vastly different from those rejected in the cases Plaintiffs rely on. *See e.g.*, *Godun*, 135 F.4th at 711–12 (finding "the color of the advisal text blends into the background" "hard to read" and "would not expect a reasonable internet user's attention to be drawn to it"); *Chabolla*, 129 F.4th at 1156–57 (terms of use was "written in small gray font against a white background" and was placed "outside of the user's natural flow"); *Weeks v. Interactive Life Forms, LLC*, 100 Cal. App. 5th 1077, 1087 (2024) (terms of use "at the very bottom of the page [of a browsewrap] in a much smaller typeface, in gray text against a black background . . . sandwiched between similar links for the 'sitemap' and 'privacy policy'"); *Berman*, 30 F.4th at 856 (hyperlinked terms and conditions were "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in front so small that it [was] barely legible to the naked eye."); *Sellers, LLC*, 73 Cal. App. 5th at 479 (the textual notice was "below the white payment box, outside the user's primary area of focus, and not in 'visual proximity to the request for consent'").

Moreover, the overall design of the pop-up screen was "uncluttered," and the entire pop-up screen was "visible at once [that] the user does not need to scroll beyond what is immediately visible to find notice." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (holding that the design of the screen and language used rendered the notice provided "reasonable as matter of California law").

Plaintiffs claim that they never saw "any hyperlinks referencing UPS terms and conditions nor any other UPS documents" (Franklin Decl. ¶ 5, Dkt. 22-1; Lomeli Decl. ¶ 15, Dkt. 22-3) or that they "never knew that [the UPS terms] existed" (Franklin Decl. ¶ 7; *see also* Lomeli Decl. ¶ 15 ("never seen or read" the terms)). However, courts analyze "whether the website puts *a reasonably prudent user* on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (emphasis added). Thus, it does not matter that Plaintiffs did not see or read the terms if the court finds that a reasonably prudent user would have done so. In fact, the California Supreme Court has explicitly stated that "[a]n arbitration clause within a contract may be binding on a party even if the party never actually read the clause." *Pinnacle Museum Tower Assn v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012). Therefore, Plaintiffs' argument lacks merit. Accordingly, the Court finds that the visual aspects of the pop-up screen provided reasonably conspicuous notice of the three agreements.

**ii. Context of the Transaction**

Next, courts consider whether the nature of an agreement may anticipate "some sort of continuing relationship . . . that would require some terms and conditions[.]" *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th at 477; *see Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1018 (9th Cir. 2024). Following California case law, the Ninth Circuit considers, for example, "(1) whether the transaction contemplates a continuing relationship by creating an account requiring a full registration process; (2) whether the user is entering a free trial; (3) whether a user enters credit card information; and (4) whether the user has downloaded an app on their phone (suggesting consistent accessibility)." *Godun*, 135 F.4th at 710 (quotations and citations omitted).

The transaction here is most analogous to the one found in *Oberstein*, where the Ninth Circuit found that the transaction required "a full registration process" and therefore "reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517. Similarly, the third-party websites required a full registration process before

customers could purchase UPS labels. For example, to create a UPS shipping label through Pirate Ship, the customers had to enter the address the package was being shipped to and from, the weight and dimensions of the package, and the payment information. Coleman Decl. ¶ 19. Given the full registration process, reasonably prudent users would have likely anticipated some sort of continuing relationship.

Accordingly, the Court finds that the pop-up screen provided reasonably conspicuous notice of the three agreements.

**c. Manifestation of Assent**

For the second step of the analysis, the Court considers whether Plaintiffs took any action that "unambiguously manifest[ed] his or her assent" to the proposed contractual terms. *Keebaugh*, 100 F.4th at 1018. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858; *see also Nguyen*, 763 F.3d at 1176 ("Courts have also been more willing to find the requisite notice for constructive assent . . . where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website.")

Here, the pop-up screen clearly stated that Plaintiffs were agreeing to the terms in the three documents by clicking on the action buttons:

- "To proceed, just agree to and accept the Terms and Conditions, UPS Prohibited Articles and UPS Technology Agreement." Coleman Decl. ¶ 30.
- "To proceed, please accept the terms below. [¶] By checking this box, I accept and agree to . . . ." *Id.* ¶ 20.
- "To start shipping with UPS, you must first agree to the following . . . ." Barber Decl. ¶ 21.
- "By proceeding, you agree to the above terms and conditions." *Id.* ¶ 8.

Thus, the pop-up screen contained "explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Nguyen*, 763 F.3d at 1177.

Nevertheless, Plaintiffs claim they never did "anything that would indicate that [they were] agreeing to be bound by the UPS terms and conditions." Franklin Decl. ¶ 6; Lomeli Decl. ¶ 14. However, "[m]utual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Sellers*, 73 Cal. App. 5th at 460; *see also Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (courts evaluate "whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement."). Thus, their subjective beliefs that they were not agreeing to be bound by UPS' terms and conditions when purchasing the UPS labels are immaterial.

Moreover, Plaintiffs do not dispute that they opened accounts with these third-party retailers and purchased UPS labels through them. *See* Franklin Decl. ¶¶ 3, 11; Lomeli Decl. ¶¶ 13, 14. By opening an account and going through the online process to purchase UPS labels, Plaintiffs unambiguously manifested assent to the three agreements and the incorporated arbitration provision. *See e.g., Oberstein*, 60 F.4th at 517 ("[T]he notices at issue explicitly alert the user that by creating an account, signing in, or purchasing a ticket, and proceeding to the next page, the user 'agrees to our Terms of Use.' ... [T]hat is all that is required." (citation omitted)); *Ortiz*, 2025 WL 3765497, at *3 (reversing district court's order denying motion to compel arbitration and finding that "[u]nlike the 'Continue' button in *Berman*, [defendant's] 'Agree' button *itself* informed users like [plaintiff] that they were 'Agreeing' to the Member Agreement just acknowledged.").

Accordingly, the Court finds that Plaintiffs and UPS entered into a valid, enforceable arbitration agreement.

**d. Defenses**

Under the FAA, a court may declare an arbitration agreement unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2,

and may invalidate an arbitration agreement by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Concepcion*, 563 U.S. at 339 (citation omitted). The Court finds that none of the defense apply here.

**i. Parties to the Agreement**

Plaintiffs first claim that the UPS agreements[2] do not apply to them because they are between UPS and the third-party retailers. Opp'n 13–14. However, UPS Tariff/Terms and Conditions of Service defines "Claimant" as "any person asserting . . . any claim for damages, refunds, credits . . . arising out of or related to the provision of services by UPS." Barber Decl. Ex. DD at 32, Ex. EE at 42; Coleman Decl. Ex. A at 18, Ex. B at 26. Since Plaintiffs are seeking damages for alleged overcharges related to UPS' delivery service (Dkt. 1 ¶¶ 2-5, 31), Plaintiffs fall squarely within this definition. Therefore, Plaintiffs are parties to the arbitration agreement.

**ii. Whether the Agreement is Illusory or Unconscionable**

Next, Plaintiffs contend that the UPS Terms and Conditions is illusory or, in the alternative, procedurally and substantively unconscionable, and therefore any arbitration provision incorporated by that agreement is unenforceable.[3] Opp'n 14–16. Specifically, Plaintiffs takes issue with the clause: "UPS may . . . in its sole and unlimited discretion,

---

[2] Plaintiffs' argument also lacks merit as the Technology Agreement, for instance, clearly distinguishes customers like Plaintiffs from a third party retailer. Specifically, the Technology Agreement defines "Service Provider" as "a third party engaged by a UPS customer to assist such UPS customer in managing its shipping activity with the UPS Parties . . . " while "You" is defined as "an individual." Suppl. Coleman Decl. Ex. L at 4, Ex. M at 65.

[3] The Court rejects Defendants' argument that enforceability of a contract is for the arbitrator to resolve (Reply 7–8). The arbitration provision clearly states that "All issues are for the arbitrator to decide, except that issues relating to the scope, application, and enforceability of the arbitration provision . . . are all issues for a court to decide." Coleman Decl. Ex. A at 19; *see also id*. Ex. B at 28; Barber Decl. Ex. EE at 44.

terminate, modify, suspend or discontinue all or part of the services, rates, or this agreement." Opp'n 19.

First, "it has long been the rule [in California] that a provision in an agreement permitting one party to modify contract terms does not, standing alone, render a contract illusory" because of the "implied covenant of good faith and fair dealing" implicit in every contract." *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 706 (2013); *see also Harris v. TAP Worldwide, LLC*, 248 Cal. App. 4th 373, 389 (2016).

Second, the arbitration provision in UPS Tariff/Terms and Conditions of Service does not contain a similar clause. Thus, even if the Court finds the UPS Terms and Conditions to be unconscionable, such clause does not automatically make the whole agreement or the arbitration provision, set forth in a separate agreement, unconscionable. *See Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1033 (9th Cir. 2016) ("Although we have held that a unilateral modification provision itself may be unconscionable, *see Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003), we have not held that such an unconscionable provision makes the arbitration provision or the contract as a whole unenforceable."). Thus, Plaintiffs' reliance on *Ingle* is misplaced as the Ninth Circuit in *Ingle* found the arbitration agreement enforceable based on multiple one-sided provisions (328 F.3d at 1180); it did not hold that a single unconscionable provision renders the entire agreement unenforceable.

Moreover, the party claiming unconscionability bears the burden of proof. *Tompkins*, 840 F.3d at 1023. While Plaintiffs cite to a number of cases from outside this circuit, none applies California law. *See* Opp'n 15–16. Plaintiffs have failed to demonstrate that the arbitration provision here is unconscionable. Therefore, Plaintiffs have not carried their burden. Accordingly, the Court finds that the arbitration provision is enforceable.

**2. Scope of the Arbitration**

Once it is established that a valid, enforceable arbitration agreement exists, courts must consider whether the dispute falls within the scope of the arbitration agreement. Here, the arbitration provision states in relevant part:

> Claimant and UPS agree that . . . any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by individual (not class-wide or collective) binding arbitration.

Barber Decl. Ex. DD at 34, Ex. EE at 44; Coleman Decl. Ex. A at 19, Ex. B at 27–28. Again, given that Plaintiffs seek damages for alleged overcharges related to Defendant's delivery service (Compl. ¶¶ 2-5, 31), Plaintiffs' claims seem to fall squarely within the scope of the arbitration provision.

Citing two out-of-circuit cases, Plaintiffs contend that "intentional theft . . . through an illegal surcharge scheme has nothing whatsoever to do with the provision of services by UPS." Opp'n 17. However, both cases are easily distinguishable. First, *Sivak v. United Parcel Services Company*, 28 F.Supp.3d 701 (E.D. Mich. 2014) does not involve a motion to compel arbitration. While *Solo v. UPS*, 947 F.3d 968 (6th Cir. 2020) deals with a motion to compel arbitration, the Sixth Circuit affirmed district court's order denying the motion because the newer version of the arbitration agreement that defendant attempted to invoke was not in the contract that was in effect during the relevant class period. 947 F.3d at 973–74. Moreover, the Sixth Circuit found that defendant had waived its right to arbitrate. *Id.* at 974.

Accordingly, Plaintiffs' claims against Defendant are within the scope of the parties' arbitration agreement.

## IV. CONCLUSION

Accordingly, the Court **GRANTS** Defendant's Motion to Compel Arbitration and **STAYS** the action pending resolution of arbitration. *See* Mot. at 31 ("Upon compelling arbitration, the Court should stay this action, consistent with Section 3 of the FAA."); *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration," the Federal Arbitration Act "compels the court to stay the proceeding."). The parties shall file a joint

status report every six months (on March 10 and September 10 of each year) *and* within one week of the arbitration action's conclusion.

**IT IS SO ORDERED.**

Dated: September 11, 2026

Honorable Linda Lopez
United States District Judge